UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------- x

UNITED STATES OF AMERICA,

                                      07 Cr. 543   (DLI)

        -against-

KAREEM IBRAHIM,

                        Defendant.

-------------------------------------------- x

**MEMORANDUM OF LAW TO SUPPLEMENT OPPOSITION TO THE GOVERNMENT'S MOTION FOR AN ANONYMOUS JURY AND IN SUPPORT OF DEFENDANT KAREEM IBRAHIM'S MOTION TO COMPEL THE GOVERNMENT TO PROVIDE MATERIAL PURSUANT TO RULE 16 AND _BRADY_**

### PRELIMINARY STATEMENT

Defendant Kareem Ibrahim submits this memorandum of law to supplement the opposition submitted by codefendant Russell Defreitas to the government's motion for an anonymous jury, and, in conjunction, to compel the government, pursuant to Rule 16 of the Federal Rules of Criminal Procedure or _Brady v. Maryland_, to provide material information from the prosecution as well as from elements of the United States intelligence community[1] responsible for overseeing or implementing national security matters.

### DISCUSSION

---

[1]  The term "intelligence community" is defined and described in section V.A. below.

1

## I.    Overview

Ibrahim joins in the arguments set forth by counsel on behalf of codefendant Defrietas.  Ibrahim also submits, however, that it is not possible to adequately respond to the government's motion absent the disclosure of certain Rule 16 or *Brady* material relating to Yasin Abu Bakr or the Jamaat al-Muslimeen ("JAM"). Specifically, based on the information described below, there is reason to believe that: the government's assertions regarding Abu Bakr and JAM -- which the government uses as a principal basis for its anonymous jury motion -- are inaccurate or incomplete; elements of the United States intelligence community, as that term is defined and described below, possess information that is material to the defense in this regard; and, because such elements were involved in the investigation of this case, they are subject to the prosecution's *Brady* and Rule 16 disclosure obligations.

Information as to each of Ibrahim's requests is material to the defense, and its disclosure is required under Rule 16 or *Brady*, for the following reasons.

## II.    Factual Background

Ibrahim, along with codefendants Russell Defreitas, Abdul Kadir and Abdul Nur, are charged with various conspiracies to attack John F. Kennedy Airport ("JFK Airport"): conspiracy to attack a public transportation system, in violation of 18 U.S.C. § 2332f; conspiracy to destroy a building with fire and explosives, in violation of 18 U.S.C. § 844; conspiracy to attack

aircraft and aircraft materials, in violation of 18 U.S.C. § 32; conspiracy to destroy international airport facilities, in violation of 18 U.S.C. § 37; and conspiracy to attack a mass transportation facility, in violation of 18 U.S.C. § 1992. Defreitas and Kadir are charged with conducting surveillance of a mass transportation facility with intent to attack it, in violation of 18 U.S.C. § 1992.

The facts the government expects to prove at trial, as recently stated in its Memorandum In Support Of Its Motion For An Anonymous Jury And Other Related Protective Measures ("Anon. Jury Mot."), place significant emphasis on Abu Bakr and JAM.  While Ibrahim concedes none of the government's allegations, it is necessary to discuss them here for the purpose of understanding why the government's response to the instant requests is now required.

According to the government, Defreitas began planning a terrorist attack on JFK Airport in early 2006.  *Id.* at 4.  He later recruited the government's confidential informant, a/k/a Steven Francis, to join the plot in August of that year.  *Id.* The following month, the two traveled to Guyana and met "multiple co-conspirators" to discuss the alleged plot.  *Id.*  The discussions included the topic of meeting Abu Bakr, the leader of JAM, which the government describes as militant.  *Id.* at 4-5. Abu Bakr was identified because he "was believed to have the means to locate a known al-Qaeda operative who had connections to Guyana and was rumored to be hiding in the Caribbean."  *Id.* at 5.

3

Nur, a Guyanese national, was to travel to Trinidad in December 2006, but he did not go. *Id.* at 5.

Meanwhile, Francis and Defreitas returned to New York, and, in early January 2007, they conducted surveillance of JFK and videotaped locations there. *Id.* at 5. Soon thereafter, in mid-January 2007, they went back to Guyana. *Id.* at 6. While in Guyana, they showed the footage to Nur and other alleged co-conspirators – two of whom decided to cease participation. *Id.* at 6. Around this time, the government apparently purchased an airline ticket for Nur to travel to Trinidad and meet Abu Bakr, but once again Nur did not go. *Id.* at 5-6.

Then, in February 2007, Francis and Defreitas – still in Guyana – met with Kadir. *Id.* at 6. They showed Kadir the footage of JFK and discussed aspects of the alleged plot with him, including presentation of the "plan" to Abu Bakr. *Id.* at 6-7. Subsequently, in March 2007, after returning to New York and obtaining Google Earth images of JFK, Francis and Defreitas spoke with Kadir by telephone. *Id.* at 7. Kadir, whose participation was allegedly to have included recruiting other individuals, indicated there was no interest. *Id.* at 6-8.

Nevertheless, the government apparently purchased three more tickets for Francis, Defreitas and a third individual to travel to Trinidad to meet Abu Bakr. *Id.* at 8. While trying to figure out who would accompany them, Francis and Defreitas returned to Guyana. *Id.* at 8. For a while it appeared that Kadir would go along to Trinidad, but Kadir later said that he

would be unable to travel. *Id.* at 8-9. Kadir indicated that he would contact brothers in Trinidad about meeting with Abu Bakr and evidently advised caution due to "international" surveillance of Abu Bakr based on suspected links with Muammar al-Gaddafi. *Id.* at 9.

On May 20, 2007, Francis and Defreitas arrived in Trinidad, where an acquaintance of Kadir picked them up at the airport and took them to Ibrahim's house. *Id.* at 9. On May 22, Francis, Defrietas and Ibrahim went to the JAM compound and met up with Nur, who had traveled to Trinidad on another flight. *Id.* at 9. Nur indicated that he had spoken with Abu Bakr about the alleged plan – but, the following night, after Francis and Defreitas screened the JFK footage for Ibrahim and showed him the Google Earth images, Ibrahim advised against presenting the plan to Abu Bakr. *Id.* at 10.

According to the government, Ibrahim took the JFK materials and indicated he would send an associate to present the alleged plot to individuals "in Iran and/or the United Kingdom." *Id.* at 10-11. Francis and Defreitas returned to New York shortly thereafter. *Id.* at 11. Three days after their return, they called Ibrahim, and, according to the government, Ibrahim indicated that he had "recruited" an individual whom Francis and Defreitas had met during their stay in Trinidad to travel to Iran and present the plot to militants in that country. *Id.* at 11. Ibrahim was arrested four days later, on June 2, 2007.

### III.    Material Now Sought

Based on the facts set forth by the government, and publicly available information regarding Federal interagency cooperation as set forth in section V.A. below, it is necessary to request, pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963), the following:

1. Any information in the possession of any United States Federal agency or the United States intelligence community indicating that neither Yasin Abu Bakr nor JAM posed a meaningful threat to the United States, United States citizens, or members of the United States government, or that neither Yasin Abu Bakr nor JAM were likely or capable of carrying out such a threat;

2. Any information in the possession of any United States Federal agency or the United States intelligence community in connection with Yasin Abu Bakr or JAM posing an actual or perceived threat to the United States, a United States citizen, or members of the United States government;

3. Any security assessment prepared by any Federal agency regarding Yasin Abu Bakr in 2009 in connection with the 2009 Summit of the Americas[2], or any information gathered by the United States intelligence community regarding the same; and

---

[2] The fifth Summit of the Americas was held in Port of Spain, Trinidad and Tobago, and was visited by various heads of states, including the President of the United States.  *See* http://www.summit-americas.org/

6

4. Any information in the possession of any Federal agency or the United States intelligence community tending to undermine allegations of Yasin Abu Bakr's or JAM's "pattern of violence and criminality", "international drug trafficking", "kidnapping", "money laundering", "extortion and political corruption", "witness tampering", and "links with Libyan leader Mohamar Qadafi and other Islamic militant organizations" as set forth in the government's memorandum in support of its anonymous jury motion at p. 12-13.

## IV.    Legal Framework

### A. Rule 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (E) Documents and Objects.  Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs ... or portions of any of these items, if the item is within the government's possession, custody or control and:
> (i) the item is material to preparing the defense.

The availability of discovery from the government in criminal cases has gradually broadened since Congress began a series of amendments to Rule 16 in 1966.  See *United States v. Ghailani*, 2010 WL 653269, *2 (S.D.N.Y. Jan. 21, 2010 (citing Charles Alan Wright, 2 Federal Practice And Procedure: Criminal § 251 (3d ed.2000).  The Second Circuit has not defined "the government" for the purposes of Rule 16, nor has it analyzed the meaning "possession, custody or control" of the government within the context of the Rule.  *See United States v. Chalmers*, 410

F.Supp.2d 278, 288 (S.D.N.Y. 2006).  Nevertheless, this Court has held that, where there is a question as to whether *Brady* obligations extend laterally to a governmental agency other than the Department of Justice, the analysis turns on the degree of any such agency's joint participation in the investigatory process.  *United States v. Upton*, 856 F.Supp. 727, 749 (E.D.N.Y. 1994) ("The key to the analysis, therefore, is the level of involvement between the United States Attorney's Office and the other agencies.... [T]he inquiry is the extent to which there was a 'joint investigation' with another agency.").  *See also Ghailani*, 653269, *fn21 (collecting cases from the Eastern and Southern Districts).

   **B. *Brady***

         In *Brady*, 373 U.S. at 87, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The Court later refined this ruling, holding that the duty to disclose such evidence is applicable even if there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).

         In light of *Brady* and its progeny, "the individual prosecutor has a duty to learn of any favorable evidence known to

8

the others acting on the government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The obligation to disclose *Brady* material "exists without regard to whether it has been recorded in tangible form." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). Disclosure must be made "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *Id.* at 226; *see also,* e.g., *Leka v. Portuondo,* 257 F.3d 89, 99-103 (2d Cir. 2001). Close cases and doubtful questions are resolved in favor of disclosure. *Agurs*, 427 U.S. at 108; *Kyles*, 514 U.S. at 439 (citing *Agurs*).

**V.      Analysis**

**A. There Is Reason To Believe The Government's *Brady* and Rule 16 Obligations Extend To Components Of The Intelligence Community.**

Based on the information available to the defense at this time, there is reason to believe that the investigation in this case involved various parts of the government, including the United States intelligence community, as that term is defined and used below. Specifically, available sources indicate that there was interagency cooperation. In order to understand the defense's current position in this regard, it is necessary to discuss publicly available information regarding the government's investigation of this case and the general structure of the intelligence community.

As a threshold matter, the President of the United States was briefed and updated regularly as the investigation

9

into the alleged plot progressed.  Authorities Hunt Fourth Suspect in JRK Bomb Plot In Trinidad, available at http://www.foxnews.com/story/0,2933,277434,00.html ("Jeanie Mamo, a spokeswoman for the White House, said President George W. Bush had been briefed and updated regularly as the investigation into the plot progressed.").

Further, currently available information indicates that the investigation involved the United States intelligence community.  N.Y. Airport Target Of Plot, Officials Say, available at http://www.washingtonpost.com/wp-dyn/content/article/2007/06/02/AR2007060200606.html ("The alleged conspirators, authorities said, were initially detected via information gathered by the CIA in South America and the Caribbean, home to Jamaat Al Muslimeen, an extremist Black Muslim group that tried to overthrow the Trinidadian government in 1990."); Four Charged In Plot To Blow Up JFK Airport, available at http://www.reuters.com/article/idUSN0238499820070602 ("White House spokeswoman Jeanie Mamo said President George W. Bush had been briefed and updated regularly on the progress of the investigation. 'This case is a good example of international counterterrorism cooperation,' she said.").  The White House Fact Sheet: President Bush Has Kept America Safe, available at http://georgewbush-whitehouse.archives.gov/news/releases/2008/12/20081217-5.html ("[Following September 11, 2001, t]he President deployed all elements of national power to combat terrorism, which had previously been considered primarily a 'law

10

enforcement' issue. . . . Under the President's watch, numerous terrorist attacks have been prevented in the United States. These include: An attempt to bomb fuel tanks at JFK airport…") (emphasis supplied).

Based on research conducted by the defense to date, our understanding of the "intelligence community" and its general structure is as follows.  The President is advised on national security matters by the National Security Council ("NSC").  50 U.S.C. § 402(a)-(b).  There is a Director of National Intelligence ("DNI"), whose responsibilities include serving as head of the intelligence community and acting as the principal adviser to the President and the NSC about matters relating to national security.  50 U.S.C. § 403(a)-(b).  The intelligence community includes the Office of the DNI; the CIA; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the Army, the Navy, the Air Force, the Marine Corps, the Federal Bureau of Investigation, and the Department of Energy; the Bureau of Intelligence and Research of the Department of State; the Office of Intelligence and Analysis of the Department of the Treasury; the elements of the Department of Homeland Security concerned with the analysis of intelligence information, including the Office of Intelligence of the Coast Guard; and, such other

elements of any other department or agency as may be designated by the President, or designated jointly by the Director of National Intelligence and the head of the department or agency concerned, as an element of the intelligence community.  50 U.S.C. § 401a(4).

Within the intelligence community, the DNI "ha[s] principal authority to ensure maximum availability of and access to intelligence information within the intelligence community consistent with national security requirements."  50 U.S.C. 403-1(g).  Among other duties, the DNI maintains a list of individuals known or suspected to be international terrorists, as well as organizations known or suspected to be terrorist organizations.  50 U.S.C. § 404n-2.  The DNI shares "the list, and information on the list, with such departments and agencies of the Federal Government, State and local government agencies, and entities of foreign governments and international organizations as the Director considers appropriate."  *Id.* at (c).

In light of the structure of the intelligence community and the apparent interagency coordination here, there is reason to believe that components of the intelligence community directly or indirectly provided information, at one point or another, that impacted the prosecution's investigation. For this reason, any such component or components are subject to the government's *Brady* and Rule 16 disclosure obligations.

**B. *Brady* Or Rule 16 Disclosure Is Mandated.**

The Rule 16 or *Brady* material sought by the defense covers two principle categories: information regarding JAM and matter that is potentially exculpatory or impeaching. Information about Yasin Abu Bakr and JAM is particularly salient at this stage of the case because the government asserts that the threat that JAM allegedly poses to the integrity of the judicial proceedings is a basis for an anonymous jury.  The government's view in this regard is based largely on JAM's history as asserted by the Jamestown Foundation.  *Id.* at 12-14, 18-19.

Interestingly, according to Wikipedia, which defendant notes is neither a scholarly source nor news agency that warranties the information its supplies on its website (*see* http://en.wikipedia.org/wiki/Wikipedia: General_disclaimer "WIKIPEDIA MAKES NO GUARANTEE OF VALIDITY"), the Jamestown Foundation has been criticized as impartial, in some views representing "a neoconservative agenda driven think-tank with ties to the CIA and United States government."  *The Jamestown Foundation*, *Wikipedia* (available at http://en.wikipedia.org/wiki/ The_Jamestown_Foundation#cite_note-fs-1).

Be that criticism as it may, even the Jamestown Foundation considers JAM's influence to be strictly localized. *Jamaat al-Muslimeen: The Growth And Decline Of Islamist Militancy In Trinidad And Tobago*, Terrorism Monitor, Vol. 7, Issue 23, 7/30/09 (available at http://www.jamestown.org) ("[W]hile many observers continue to mistakenly link JAM to international extremist movements with a transnational agenda such as al-Qaeda,

13

*the evidence suggests that JAM's brand of militancy has played out solely within a local Trinidadian context to further narrow objectives and there are no indications to suggest that this will change*.") (emphasis supplied).  What is more, the Jamestown Foundation considers JAM essentially impotent at this time, even at the local level:

> On the surface, the failure of Abu Bakr's latest [legal] appeal may have sounded the death knell for JAM as an influential player in Trinidadian society and politics. While JAM has always been a fringe movement among both Trinidadian Muslims and non-Muslims alike, the overwhelming financial burdens of potential property losses coupled with growing defense fees may devastate the organization once and for all.

*Id.*

Thus, it appears that the government's description of JAM is incorrect.  Given the apparent interagency coordination in this matter, it is therefore necessary for the defense to be provided with any *Brady* or Rule 16 material among the intelligence community regarding Abu Bakr and JAM as set forth in (1) – (4) above.  Such information is material because it would tend to undermine the government's argument for the need of an anonymous jury, and, without such information, it is not possible to adequately respond to the government's motion.

**VI.    Conclusion**

For the foregoing reasons, an order directing the government to provide to the defense the information described above is required.  In the alternative, for the reasons set forth herein as well as the opposition to the government's motion for an anonymous jury submitted by codefendant Defreitas, it is

14

necessary to hold an evidentiary hearing to determine the

accuracy of the government's assertions.

Dated:      March 22, 2010
            New York, NY


                              Respectfully submitted,



                              _____s/_____
                              MICHAEL O. HUESTON, ESQ.
                              *Attorney for Defendant Kareem Ibrahim*
                              350 Fifth Avenue, Suite 4810
                              New York, New York 10118
                              (212) 643-2900



                              ZOE DOLAN, ESQ.
                              *Associate Counsel*
                              30 Vesey Street – Suite 100
                              New York, New York 10007
                              (347) 301-5180


Original Filed By ECF

Assigned Document Number _____


15

**DECLARATION OF SERVICE**

Michael O. Hueston, Esq. declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

On March 22, 2010, I served the annexed Memorandum in Opposition to the Government's Motion for An Anonymous Jury, and Motion to Compel, on:

        Assistant United States Attorneys
        Zainab Ahmad, Berit W. Berger, Jeffrey F. Knox,
        and Marshall L. Miller
        United States Attorney for
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201

        Defense Counsel

[X]  BY ELECTRONIC CASE FILING
[ ]  BY HAND
[ ]  BY FIRST CLASS MAIL
[ ]  BY FACSIMILE WITH PERMISSION


Dated:    New York, New York
           March 22, 2010


                     ____s/_____
                     MICHAEL O. HUESTON, ESQ.
                     350 Fifth Avenue, Suite 4810
                     New York, New York 10118
                     (212) 643-2900

16