

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MLM:JAJ:ZA                     *271 Cadman Plaza East*
F.#2006R00688                  *Brooklyn, New York  11201*


December 30, 2010


BY HAND

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                    Re:  United States v. Abdel Nur
                         Criminal Docket No. 07-543 (S-1)(DLI)

Dear Judge Irizarry:

          The government respectfully submits this letter in
connection with the sentencing of defendant Abdel Nur, currently
scheduled for January 13, 2011.  For the reasons set forth below,
the Court should sentence the defendant to a term of imprisonment
of 15 years, as recommended by the United States Sentencing
Guidelines (hereinafter, "USSG" and the "Guidelines") and the
United States Department of Probation.  Such a sentence will
constitute just punishment and reflect the extremely serious
nature of the defendant's terrorist offense.

I.          The Applicable Range Under the Sentencing Guidelines Is
            15 Years in Prison

          By statute, in sentencing a defendant, the Court "must
consider the Guidelines," along with the other factors listed in
18 U.S.C. § 3553(a).  United States v. Crosby, 297 F.3d 103, 113
(2d Cir. 2005).  Generally, such consideration requires a
determination of the applicable Guidelines range.  Id.  Even
after the Supreme Court's decision in United States v. Booker,
125 S. Ct. 738 (2005), the Guidelines continue to play a critical
role in sentencing.  "The guidelines cannot be called just
'another factor' in the statutory list, 18 U.S.C. § 3553(a),
because they are the only integration of the multiple factors
and, with important exceptions, their calculations were based
upon the actual sentences of many judges."  United States v.
Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (omitting internal
quotations).

In the instant case, as a result of the defendant's provision of material support to a terrorist plot to detonate explosives at John F. Kennedy International Airport ("JFK Airport"), the Guidelines offense level is 37, and the applicable criminal history category is VI. See Presentence Report ("PSR"), ¶¶ 69-81. The corresponding Guidelines range is a term of imprisonment of 360 months to life. Id. at ¶ 114. However, because the count of conviction has a statutory maximum sentence of 15 years, the Guidelines imprisonment range is 180 months. Id.; see USSG § 5G1.1(a). The defendant does not challenge this Guidelines calculation, though he does object to the PSR's characterization of the Jamaat al Muslimeen organization, as well as the scope of his role in the terrorist plot.

A.    The PSR Accurately Describes the Defendant's Role in the Terrorist Plot and Correctly Assesses No Role Adjustment

The PSR does not assess a role enhancement or reduction for defendant Nur, finding that his offense participation did not involve leadership or management responsibilities warranting an enhancement, but was too significant to warrant a mitigating role adjustment. PSR, ¶ 33. The defendant does not object to the PSR's role calculation, see Letter of Daniel Nobel, Esq., October 18, 2010 ("Nobel PSR Letter") (submitting PSR objections with no objection to Guidelines calculation); Letter of Daniel Nobel, Esq., December 20, 2010, at 2 ("Nobel Sentencing Letter") (indicating that Nur "does not challenge the PSR's recommendations as to the applicable guidelines"), but argues that the PSR's language exaggerates the role played by defendant Nur in the plot to commit a terrorist attack at JFK Airport, Nobel PSR Letter, at 3-4; Nobel Sentencing Letter, at 5-8. The government respectfully submits that the PSR and PSR Addendum accurately describe the defendant's role and appropriately assess no role adjustment.

Evidence presented at the trial of Nur's codefendants proved that Nur played a substantial role in the plot to attack JFK Airport. As set forth in the PSR and proved at trial, Nur engaged in numerous meetings with the other members of the conspiracy and agreed to serve as the link between the conspiracy and the notorious and violent radical leader Yasin Abu Bakr. See PSR, ¶ 11-12; Transcript of Trial in United States v. Russell Defreitas and Abdul Kadir ("Trial Transcript"), 2507, 2727-28, 2739-40. Nur informed the other members of the plot that he had a direct, long-standing personal relationship with Abu Bakr, Trial Transcript, 2507, 2906, and that he was a founding member of Jamaat Al Muslimeen, id. at 2727; Government Exhibit ("GE")

226T, at 3, and agreed to meet with Abu Bakr in an effort to gain his support and locate the Al Qaeda operative Adnan Gulshair el Shukrijumah, Trial Transcript, 2503-04, 2739-40.  Nur accurately advised the conspirators that Abu Bakr was connected to Libya and other terrorist organizations, id. at 2740, and was likely to be interested in assisting the plot to attack JFK Airport, id. at 2922.  Nur accurately predicted that he would be able to meet with Abu Bakr upon arrival in Trinidad.  Id. at 2740; GE 218T, at 3-4; GE 221T, at 3-4.  In May 2007, Nur traveled to Trinidad, met with Abu Bakr, presented an overview of the plot to attack JFK Airport to Abu Bakr and arranged for the conspirators to meet with Abu Bakr to further discuss the plot.  See PSR, ¶ 25; GE 225T, at 2; Trial Transcript, 2949, 2989.  Surveillance photographs captured Nur in Trinidad with coconspirators Russell Defreitas and Kareem Ibrahim and cooperating witness Steven Francis.  See GEs 80-83.  Nur participated in the meetings in which the conspirators recruited defendant Kareem Ibrahim to join the plot and arranged with defendant Abdul Kadir to use Kadir's mosque bank account to store funds to finance the plot.  The Court should thus reject the defendant's objection that the PSR factually overstates Nur's role in the offense.

     B.    The Jamaat Al Muslimeen Is a Radical Islamic Organization That Engaged in the Most Significant Terrorist Activity in the History of the Carribean Region

       The defendant objects to the PSR's description of the Jamaat Al Muslimeen ("JAM") as a terrorist organization. However, as the evidence at trial demonstrated, JAM is an extremist Islamic organization based in Trinidad and Tobago that, over the course of the last 30 years, has engaged in criminal activity, including acts of terrorism, as well as armed robbery and narcotics trafficking.  Trial Transcript, 3757, 3765.  As explained by the Jamestown Foundation, an organization whose analysis was relied upon by the defendant in his submission to the Probation Department, "JAM's history of political militancy is only matched by the group's criminal activities – JAM is implicated in gangland-style slayings, narcotics and arms trafficking, money laundering, extortion, kidnapping, and political corruption."  Terrorism Monitor, Volume VII, Issue 23, July 30, 2009, at 8, available at www.jamestown.org/uploads/media/TM_007_69.pdf.

       The terrorist nature of the attacks conducted by Abu Bakr and JAM in 1990 cannot be seriously questioned.  As proven at trial through expert testimony, in pursuit of the establishment of an Islamic state in Trinidad and Tobago, one of

4

JAM's stated goals, Trial Transcript, 3765-66, Abu Bakr led JAM in executing a violent coup attempt, involving armed assaults on the country's parliament building, television station and police headquarters. The attack on the police headquarters consisted of a suicide car bombing, causing massive damage. Id. at 3766-67. In the course of the attack on the parliament building, JAM members shot the nation's Prime Minister, killed police officers and took the Prime Minister and approximately 40 others hostage. Id. at 3767-68. Abu Bakr personally led the armed attack on the television station, after which he took to the airwaves to announce that JAM had taken over the government. Id. at 3769. At trial, Nur's codefendant Abdul Kadir admitted on cross-examination that he knew of no other person or group who had ever committed such terrorist attacks in the Caribbean region. Id. at 4458.

Defendant Nur spills much ink attempting to distinguish JAM's criminal and terrorist goals and techniques from those of Al Qaeda.[1] But in the context of this case, the distinctions Nur attempts to identify are without a difference. JAM is a radical, violent organization. Nur arranged a meeting between men plotting to commit a terrorist attack at JFK Airport and JAM's leader, the lead perpetrator of the Caribbean's most notorious and deadly terrorist acts. Whether Nur's conduct would have been worse if he had succeeded in also presenting the plot to Al Qaeda in no way mitigates the reprehensibility of what he did accomplish in connecting the plotters to JAM.

In sum, the PSR correctly identifies JAM as a radical Islamic organization that has engaged in terrorist activity, and the Court should reject the defendant's objection to that characterization.

C.    The PSR Correctly Assesses the Sentencing Range under the Guidelines

The Court should adopt the Guidelines calculation set forth in the PSR. The Guidelines range "should serve as 'a benchmark or a point of reference or departure'" in determining the sentence. United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006) (quoting United States v. Rubenstein, 403 F.3d 93, 98-

---

[1] Of course, it should be noted that, in connection with the plot, Nur also took active steps to contact Shukrijumah, a leader of Al Qaeda, Trial Transcript, 2503-04, 2739-40, which he concedes in his submission is a nihilistic, international terror organization.

5

99 (2d Cir. 2005)).  For the reasons set forth below, a Guidelines sentence will constitute just punishment for the defendant's extraordinarily serious criminal conduct.

II.      Application of Factors under 18 U.S.C. § 3553

   A.   The Nature and Circumstances of the Offense Weigh in Favor of a Guidelines Sentence

As the evidence demonstrated at trial, had the plot to which defendant Abdel Nur provided material support succeeded in bombing JFK Airport and its fuel tanks and pipelines, it would have caused massive harm – personal and economic – to the United States, the City of New York and its residents and visitors.  It almost goes without saying that exploding bombs at one of the busiest airports in the world would have injured and killed scores of people.  Indeed, that was one of the goals of the plot.[2]  Trial Transcript, 2496, 2514 (discussing the inevitable loss of lives).  In addition to the injuries and loss of life, such an attack would have caused severe harm to the economy of the United States and New York City by incapacitating one of the world's most important international transportation hubs.  Id. at 2399-2401 (indicating that JFK Airport handled 440,000 flights, 48 million passengers and 1.7 million tons of cargo in 2007).

In pleading guilty, the defendant admitted under oath that the goal of the plot was to cause "the extensive destruction of the fuel tanks or of the planes at JFK International Airport" in order "to cause major economic loss in the United States." Plea Transcript, June 29, 2010, at 40.  The defendant further stated under oath that he agreed to "provide material support to [the plotters] by assisting them during the trip to Trinidad and Tobago, which trip took place in May 2007," and that he "travel[ed] to Trinidad and Tobago in May of 2007 and [] provided

---

[2] The defendant claims that he did not know that the plotters intended to harm and kill individuals.  The evidence proves otherwise.  First, the plotters discussed openly that people would die as a result of the plot, Trial Transcript, 2496 (describing discussions of casualties at plot meetings), and that the goal was to cause a devastating explosion of the fuel pipeline that ran throughout Queens, id. at 2737-38.  Second, the notion that anyone could believe that exploding bombs, fuel tanks and a fuel pipeline to cause "extensive destruction" at one of the world's busiest airports, Plea Transcript, June 29, 2010, at 40, located adjacent to dense residential neighborhoods, might not kill people is preposterous.

6

them with protection, introduction and guidance in order to assist them in their development and plan to attack the fuel tanks or fuel by planes in JFK Airport in order to cause major economic harm in the United States." Id.

The defendant's support for the terrorist plot was not only material but significant. As set forth in more detail above, the defendant aided the plotters' efforts to put the plan into action, by, inter alia, assisting the efforts to locate Al Qaeda operative Shukrijumah, serving as the link between the plotters and the violent Islamic radical Yasin Abu Bakr and presenting the plot to Abu Bakr.

The defendant argues that the conspiracy was inchoate and in a state of flux. But the evidence at trial proved that the conspirators were committed to their destructive plot and had taken numerous concrete steps towards making it a reality. Among other steps, the conspirators had obtained video surveillance and satellite imagery of JFK airport and its fuel system, performed in-person reconnaissance of the airport, attempted to gain access to explosives from mines in Guyana, traveled to multiple foreign countries in pursuit of the plot and identified a bank account in which to store terrorist financing. Most significantly for this sentencing, the defendant himself presented the plot to a notorious radical who had personally overseen terrorist acts, including a suicide bombing and the shooting of a head of state, and arranged a further meeting with that terrorist leader. The defendant's argument that the plot was not moving forward is belied by the evidence and should be rejected out of hand.

In sum, based on the extraordinarily serious nature of the offense and the defendant's role therein, a Guidelines sentence is warranted.

B.   The Court Should Reject the Defendant's Argument that His Motivation to Support the Plot Mitigated His Culpability

In his submission to the Court, defendant Nur argues that he deserves leniency because he committed the offense as the result of a desire for money and travel, rather than ideology or personal commitment. See Nobel Sentencing Letter, at 5. The Court should reject this argument, as the evidence proves the claim false. Coconspirator Donald Nero testified that, when presented with the plot to explode bombs at JFK Airport, defendant Nur immediately agreed to participate and stated that "for him, it's good, it's a getback." Trial Transcript, 2505. Nero explained that Nur told him "that America oppressed people a

lot, they threat[ened] them really bad, he was living in America sometime and he got treated really badly, he got incarcerated . . .   It was a getback for him." Id. at 2505-06. The evidence presented at trial thus proved clearly that Nur's motives for supporting the plot to attack JFK Airport were ideological animosity towards the United States and a desire for personal revenge.  To the extent that Nur also committed the instant offense for monetary gain, such a pecuniary motive enhances, rather than mitigates, his culpability in providing material support to a dangerous terrorist plot.  Avarice is no less powerful and no less dangerous a motivator than is ideology.

Defendant Nur further claims that he "absconded" from the group when he arrived in Trinidad and that he did not meet with Abu Bakr.  Nobel Sentencing Letter, at 7.  However, the evidence presented at trial again proves otherwise.  To the extent that Nur "absconded," he "absconded" to the JAM compound to find Abu Bakr and present the plot to commit a terrorist attack at JFK Airport.  Trial Transcript, 2947.  Within two days of arrival, Nur met with Francis and Defreitas in Trinidad and immediately and without hesitation engaged in conversations and meetings in furtherance of the plot.  Id. at 2947-2952. Moreover, Nur not only indicated that he had set up a meeting with Abu Bakr for the group, id. at 2949, but expressed his own opinion that Abu Bakr had the means to support the plot and that the group should follow through with the meeting with Abu Bakr, id. at 2989.[3]

In sum, Nur's arguments regarding his motivation, role and involvement in the plot are not based on facts, but rather on mischaracterizations of the evidence.  As set forth above, Nur played a significant role in providing material support to a dangerous terrorist conspiracy.  The Court should reject Nur's

---

[3] Nur also argues that it defies realistic analysis to conclude that he met with Abu Bakr and described the plot to attack JFK Airport, but was unable to deliver a face-to-face meeting with Abu Bakr.  Nobel Sentencing Letter, at 7.  However, this argument is premised on a misunderstanding of the evidence. As set forth above, Nur did set up a face-to-face meeting for the conspirators with Abu Bakr, Trial Transcript, 2949, and urged the defendants to follow through with that meeting, id. at 2989. However, after speaking with coconspirator Kareem Ibrahim, Russell Defreitas determined that the safer and more fruitful approach would be to pursue financing and support from the revolutionary leadership in Iran, rather than through Abu Bakr.

8

efforts at securing a non-Guidelines sentence by rationalizing his involvement in a dangerous terrorist plot.

C.    The Defendant's History and Characteristics Weigh in Favor of a Sentence in the Guidelines Range

As set forth in the PSR and as proved by the evidence gathered during the investigation, the defendant has engaged in a history of criminal behavior, culminating in his provision of material support to the plot to attack JFK Airport.

Steven Francis reported that defendant Nur informed him that Nur had engaged in narcotics trafficking in Canada and the United States in the 1970s and 1980s.  This reporting is corroborated by Nur's statements during recorded conversations, see GE 224T, at 12 ("In Canada, I used to sell cocaine.  I used to sell marijuana."), and his criminal history, PSR, ¶¶ 79-83 (detailing 1988 conviction in Florida for possessing cocaine and marijuana, as well as additional marijuana arrest).  Francis also reported that Nur admitted sending portions of the proceeds of his narcotics trafficking to Abu Bakr and JAM.  Again, this reporting is corroborated by Nur's recorded statements.  See GE 224T, at 12-13.  In addition, Francis testified that Nur informed him that his employer, the owner of the Swiss House Cambio where Nur worked, see PSR, ¶ 98, engaged in narcotics trafficking, and that Nur worked as an enforcer for him.  Trial Transcript, 2914.  In particular, Francis testified that Nur stated that he "collect[ed] money from drug dealers" and was involved in "demising" or "killing" people.  Id.

Moreover, the evidence further demonstrates Nur's strong affiliation with the violent extremist organization known as JAM.  Indeed, during conversations relating to the plot, Nur stated that he was a founding member of JAM.  GE 226T, at 3.  Nur repeatedly indicated that he provided money to JAM for travel to Libya, see GE 224T, at 13; GE 226T, at 3, a state sponsor of terror from which JAM received significant financing and arms training for its members.  Trial Transcript, 3762-64.

The evidence thus demonstrates that the defendant engaged in serious criminal activity, as well as support for JAM, prior to providing material support to the plot to commit a terrorist attack at JFK Airport. The defendant's history and characteristics thus support a Guidelines sentence.

9

      D.    <u>A Sentence within the Guidelines Range Would Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment</u>

Providing material support to a terrorist plot to explode bombs at one of the world's busiest airports is among the most serious offenses in the federal criminal code. As set forth above, had the plot achieved its objective, the consequences would have been extraordinarily severe: the death of numerous innocent victims, extensive injuries to other innocent people and a significant economic injury to New York City and the United States. Only a Guidelines sentence would reflect the seriousness of the offense and promote respect for the law.

      E.    <u>The Deterrence Factor Weighs in Favor of a Sentence within the Guidelines Range</u>

The investigation and prosecution of this case represent a sterling example of how a proactive law enforcement strategy should work to fight terror within the federal criminal justice system: the identification of terrorist conspirators, an effective investigation yielding significant evidence and a successful federal criminal prosecution. To allow the defendant to escape just punishment by minimizing such significant criminal conduct would send the wrong message to those who might consider providing material support to a terrorist organization or plot. As a result, the deterrence factor also supports a sentence within the Guidelines range.

      F.    <u>Health</u>

Relying on 18 U.S.C. § 3582(c)(1)(A)(i) and USSG § 1B1.13(1)(A)(i), the defendant argues that the Court should grant him a downward departure or a non-Guidelines sentence based on his health. However, as the defendant concedes, the relied-upon statute and guideline are inapplicable, as they apply to modifications of sentences already imposed, require a motion from the Director of the Bureau of Prisons and rely upon extraordinary and compelling circumstances, 18 U.S.C. § 3582(c)(1)(A)(i), none of which are involved here. In addition, the relevant application note to USSG § 1B1.13(1)(A)(i) identifies a "terminal illness" as an extraordinary and compelling reason, but the defendant's doctor recently informed the Court that there was a substantial chance that the defendant would be cured of his current illness. As a result, the Court should not reduce the defendant's sentence based on his health.

10

### G.   Maximum Sentence

The defendant has already received a reduction from the otherwise applicable Guidelines range based on the plea agreement into which he entered.  In particular, based on the defendant's conduct and his health, as well as other prosecutorial considerations, the government offered, and the defendant accepted, a plea to providing material support to the plot to attack JFK Airport, rather than conspiring to engage in the plot itself.  The effect of that agreement was to cap the maximum sentence for the defendant at 15 years.  While such a resolution was a just and appropriate outcome, the government respectfully submits to the Court that any further reduction in sentence would be unwarranted.

### H.   Other Factors

None of the other factors identified in § 3553(a) are applicable to the case at hand.  See 18 U.S.C. § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement"); § 3553(a)(6) ("need to avoid unwarranted sentence disparities"); § 3553(a)(7) ("need to provide restitution").

### III.   Conclusion

By providing material support to a dangerous plot to explode bombs, fuel tanks and pipelines at JFK Airport, the defendant committed a deeply significant crime.  The only reasonable and just sentence for that crime would be a Guidelines sentence of 15 years in prison.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   /s/ Marshall L. Miller
      Marshall L. Miller
      Jason A. Jones
      Zainab Ahmad
      Berit W. Berger
      Assistant U.S. Attorneys
      (718) 254-6421/7553/6522/6134

cc:   Clerk of the Court (DLI) (via ECF)
      Daniel Nobel, Esq. & Doric Sam, Esq. (via email)
      Officer Frank M. Marcigliano, Jr. (by hand)