

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MLM:BWB/ZA                              *271 Cadman Plaza East*
F.#2006R00688                           *Brooklyn, New York  11201*


December 5, 2011


BY HAND AND ECF

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                    Re:  United States v. Kareem Ibrahim
                         Criminal Docket No. 07-543 (DLI)

Dear Judge Irizarry:

        The government respectfully submits this letter in
connection with the defendant's sentencing, scheduled for January
13, 2012.  For the reasons set forth below, the Court should
sentence the defendant to a term of imprisonment within or close
to the range specified by the United States Sentencing Guidelines
(hereinafter, "USSG" and the "Guidelines").  Such a sentence will
constitute just punishment and reflect the extraordinarily
serious nature of the defendant's terrorist offenses.

I.        The Applicable Range under the Sentencing Guidelines Is
          Life in Prison

        By statute, in sentencing a defendant, the Court "must
consider the Guidelines," along with the other factors listed in
18 U.S.C. § 3553(a).  United States v. Crosby, 297 F.3d 103, 113
(2d Cir. 2005).  Generally, such consideration requires a
determination of the applicable Guidelines range.  Id.  Even
after the Supreme Court's decision in United States v. Booker,
125 S. Ct. 738 (2005), the Guidelines continue to play a critical
role in sentencing.  "The guidelines cannot be called just
'another factor' in the statutory list, 18 U.S.C. § 3553(a),
because they are the only integration of the multiple factors
and, with important exceptions, their calculations were based
upon the actual sentences of many judges."  United States v.
Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (omitting internal
quotations).

2

In the instant case, as a result of the defendant's substantial role in the terrorist plot to detonate explosives at John F. Kennedy International Airport ("JFK Airport"), as well as the defendant's brazen obstruction of justice, the Guidelines offense level is 47 – four levels above the highest level on the published Sentencing Table – and the applicable criminal history category is VI.  See Presentence Report ("PSR"), ¶¶ 75-97.  The corresponding Guidelines range is a term of imprisonment of life. Id. at ¶ 129.

The defendant objects to the Guidelines calculation on the grounds that the enhancement for obstruction of justice and the terrorism enhancement should not apply.  The defendant's objections lack merit and should be rejected.

A.    The PSR Correctly Assesses an Enhancement for
      Obstruction of Justice

The defendant argues that no enhancement for obstruction of justice should apply.  However, as set forth in the PSR and the PSR Addendum, the obstruction of justice enhancement is clearly warranted.

Under U.S.S.G. § 3C1.1, in order to assess an enhancement for obstruction of justice based on false testimony, "a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Salim, 549 F.3d 67, 73 (2d Cir. 2008).  The Court must find those elements by a preponderance of the evidence.  Id. at 74-75.  That standard is clearly met in this case.

In testifying at trial, the defendant lied intentionally, willfully and repeatedly under oath about matters of the utmost materiality.  PSR, ¶ 50.  As set forth in detail in the government's August 30, 2011 letter to Officer Marcigliano, the defendant lied under oath about numerous matters of critical importance to the charges against him, including inter alia: (a) burning the video and satellite imagery of JFK Airport, (Trial Transcript ("T") 1087-89), (b) his personal relationship with Abdul Kadir, (T 1104-05), (c) his claim that Abdul Kadir did not attend the 1998 Seminar for Selected Leadership of the Islamic Movement, (T 1105), (d) his claim that he did not know that Abdul Kadir was involved in the plot to attack JFK Airport until he talked to him in prison, (T 1115-16, 1139, 1314), (e) his explanation for why he requested blueprints of JFK Airport from the other plotters, (T 1118, 1121-22), (f) his claim that his

3

statements to the plotters that he would pursue international contacts and raise money did not relate to the plot to attack JFK Airport, (T 1191-93), (g) his claim that the code words he suggested for communication with the plotters did not relate to the plot to attack JFK Airport, (T 1193-94), (h) his claim that the term "chicken farm" did not refer to the plot to attack JFK Airport, (T 1209-11), and (i) his claim that he merely pretended to join the plot to attack JFK Airport. See Govt. Letter, Aug. 30, 2011, at 5-6 (identifying non-exhaustive list of material facts about which Ibrahim testified falsely). Indeed, the defendant's testimony about his role and efforts in the plot to commit a terrorist attack at JFK Airport was riddled with lies, to the point that it was false in virtually every respect. The purpose of the defendant's willful perjury was patently clear: to mislead the jury and avoid conviction and punishment for his terrorist activities — in short, to obstruct justice. As a result, the defendant's trial testimony clearly warrants an enhancement for obstruction of justice.

With respect to the perjurious statements identified above, the defendant has submitted a series of far-fetched explanations for his false testimony, notably without citation to the recordings entered into evidence. See Def. Br. at 40-42. Those strained arguments are belied by the record, including the recordings, and by common sense.[1] For example, Ibrahim claims that his testimony regarding burning the video and Google Earth satellite imagery the night he first received them cannot be proven false since those items were never recovered. Id. at 40. First, the fact that the video and satellite imagery was not found at Ibrahim's house is entirely consistent with Ibrahim's plan to store the items in a safe location, away from his home, with an individual unknown to law enforcement. See Government Exhibit ("GE") 424T, at 54-59, 77. More importantly, the recordings themselves prove that Ibrahim testified falsely. Indeed, during a conversation recorded the morning after Ibrahim falsely claims that he burned the satellite imagery, Ibrahim and the other plotters were caught red-handed on audiotape using that very satellite imagery to plan their terrorist attack. See GE 425; GE 425T, at 49-50; see also (T 418-19 (testimony of Steven Francis that background noise on GE 425 was rustling of satellite map and that Ibrahim and conspirators were using that map to

---

[1] The government is prepared to rebut each of the defendant's far-fetched explanations at the sentencing hearing if the Court so desires. However, in order to avoid burdening the Court with unnecessary detail, the government will merely provide illustrative examples in this letter.

discuss attack)).  Moreover, during a conversation recorded days after Ibrahim falsely claims that he burned the satellite imagery, Michael "Salim" Smith was captured on tape telling Steven Francis that he had reviewed the Google Earth satellite imagery.  See GE 430T at 2-3.  The evidence thus puts the lie to the defendant's testimony and his sentencing argument.

The defendant's attempt to explain his false testimony that he did not know of Kadir's involvement in the plot until he talked with Kadir in prison, see Def. Br. at 40, is contradicted repeatedly and unequivocally by the recorded conversations, in which Ibrahim and the other plotters discussed Kadir's involvement and role in the plot in detail, GE 424T at 50, 56, 60; GE 425T at 17-19, 21, 28, 31, 43, and Ibrahim participated in, and was present for, telephone conversations about the plot with Kadir, GE 425T at 10-13, 24-26.

Similarly, the defendant's argument that, when he testified falsely that he believed Michael "Salim" Smith was supposed to travel to Iran to discuss a real chicken farm, he was confused, see Def. Br. at 41, is belied by the record and common sense.  The defendant testified repeatedly that he knew the "chicken farm" was a code for the plot to attack JFK Airport, (T 1100, 1195, 1208-09), a fact proved beyond a shadow of a doubt by the recordings, see, e.g., GE 424T at 48; GE 425T at 7-8, 15-16, 25.  The defendant further conceded on cross-examination that when he discussed Smith's travel to Iran, he was "using the code for going from Umrah to Iran in connection with the chicken farm, the JFK plot . . ."  (T 1207).  Moreover, moments before the false testimony that he believed Smith would travel to Iran to discuss a real chicken farm, Ibrahim conceded that he, himself, directed the other plotters to use the term "chicken farm" as code to refer to the plot.  (T 1210).  However, as it became clear that these admissions were devastating evidence of his guilt, Ibrahim reversed his testimony and claimed that – despite the hours of conversation about the terrorist plot and his own directions regarding use of the "chicken farm" code – he believed Smith was traveling across the world to discuss a real chicken farm.  (T 1211).  Both that testimony and the argument that he was confused fly in the face of the record and common sense and must be rejected as false.

Furthermore, during cross examination at trial, defendant Ibrahim admitted that he provided false information in the sworn affidavit that he submitted to the High Court of Justice in Trinidad and Tobago in an effort to defeat extradition to face the instant charges.  See GEs 360, 360A.  In particular, the defendant testified at trial that he provided false

statements under oath to the Trinidadian court, including: (1) a false claim that he had told the plotters that they could not engage in the plot to attack JFK Airport, (T 1184-87), and (2) a false claim that he had told the plotters that he could not be part of the plot to attack JFK Airport, (T 1336-38). Illogically, the defense now argues that these false statements under oath are not sufficiently related to the instant offense to be material. Def. Br. at 41-42. This argument makes no sense. First, the defendant submitted the false affidavit in an effort to defeat his extradition to face the very charges on which he was convicted. As a result, the obstructive conduct clearly "related to . . . the defendant's offense of conviction." U.S.S.G. § 3C1.1. Second, in that affidavit, the defendant provided false statements under oath about the very facts at issue in this case: his role in the plot to attack JFK Airport. See U.S.S.G. § 3C1.1, App. Note 4(B) (indicating that enhancement applies to perjury in separate proceeding where it "pertains to conduct that forms the basis of the offense of conviction"); United States v. Teyer, 322 F. Supp.2d 359, 366-67 (S.D.N.Y. 2004) (Lynch, J.) (holding that obstruction of justice in separate foreign prosecution warranted § 3C1.1 enhancement in part because foreign and instant prosecutions were factually intertwined). Third, the clear purpose of the defendant's false sworn statements in the affidavit was to corruptly avoid conviction and punishment in this very case. See id. (holding that obstruction of justice in separate foreign prosecution warranted § 3C1.1 enhancement because release from foreign custody through acquittal would have obstructed instant prosecution). Indeed, had the defendant succeeded in using falsehoods to hoodwink the court in Trinidad, he would likely never have been brought to justice. It is hard to imagine how much more material false statements in a pre-trial affidavit could be.

The defendant relies principally on United States v. Zaqari, 111 F.3d 307, 329 (2d Cir. 1997), to argue that the false statements he submitted under oath to the extradition court are insufficiently material. Zaqari does not help the defendant. In Zaqari, the sentencing court found that the defendant committed perjury in a state civil regulatory suit and that such perjury warranted an obstruction of justice enhancement. Id. at 328. The Second Circuit agreed with the sentencing court that perjury in a separate civil action "could constitute obstruction of justice in the instant federal offense," id. (emphasis added), so long as the perjury was willful and material, id. at 328-29. In the instant case, for the reasons set forth above, the evidence that the defendant's false sworn statements in his extradition affidavit were willful and material is overwhelming.

6

After reviewing the defendant's testimony and the parties' submissions, the Probation Department adhered to its finding that the defendant committed perjury that warranted an obstruction of justice enhancement. The Court should make the necessary findings and adopt that recommendation.

B.    The PSR Correctly Assesses the Terrorism Enhancement

The defendant next argues that the terrorism enhancement should not be applied to him because there is no evidence that his crime "involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a); see Def. Br. 35-37. This argument has no factual basis and should be rejected.

1.    Legal Standard

The enhancement contained in § 3A1.4 applies to offenses that "involved," or were "intended to promote," a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5). The Section 2332b(g)(5) definition includes convictions for, inter alia, violations of 18 U.S.C. §§ 32, 37, 2332f, 844(i), 1992 and 2332f, where those violations are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

The Second Circuit has noted that by using the term "intended to promote," the Section 3A1.4 enhancement casts a "broader net" than the statutory definition alone. United States v. Stewart, 590 F.3d 93, 137 (2d Cir. 2009). In order to satisfy the requirements of the enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help bring into being a crime listed in'" the statutory definition. Id. at 137-38 (alterations in original) (quoting United States v. Mandhai, 374 F.3d 1243, 1247 (11th Cir. 2004)). "The 'intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." United States v. Awan, 607 F.3d 306, 314 (2d Cir. 2010). Therefore, in order to satisfy that prong, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)." Id.

The Second Circuit has clarified that by requiring that a crime "be calculated to influence or affect . . . or to

retaliate against government conduct," the statute is <u>not</u> requiring "proof of a defendant's particular motive." <u>Id.</u> at 317. "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." <u>Id.</u> By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular <u>motivation</u> in committing the murder is to impress a more established terrorist with his abilities." <u>Id.</u> (emphasis in original). The Circuit has noted, however, that the enhancement's "motivational requirement" cannot be imputed to a defendant on the basis of his co-conspirators' relevant conduct as defined in U.S.S.G. § 1B1.3(a). <u>Stewart</u>, 590 F.3d at 138.

2.    <u>Application</u>

The record clearly demonstrates that Kareem Ibrahim's crimes both involved, and were intended to promote, federal crimes of terrorism. As an initial matter, there is no dispute that each of the five counts of conviction involve terrorism crimes enumerated in Section 2332b. The defendant solely contends, in a brief paragraph, that "[n]othing in the recordings introduced at trial of conversations among the conspirators establishes any evidence of Ibrahim's intent regarding a 'federal crime of terrorism' as statutorily defined." Def. Br. at 37. He is incorrect.

Ibrahim was a member of a conspiracy to attack the fuel tanks and pipelines at JFK Airport in a manner that the conspirators expected would involve large-scale loss of life and destruction of property. The goal of the attack was to cause massive harm, both personal and economic, to the United States, the City of New York, and its residents and visitors. <u>See</u>, <u>e.g.</u>, GE 424T at 51 ("That's why I tell you the World Trade Center didn't do nothing. This here will break the economy of them and they will be crying."); GE 411T at 7 ("A few people well might escape, but escape to where? The Jamaica Bay?"). There can be no doubt that Ibrahim supported and intended to further this goal.

In the discussion leading up to Russell Defreitas's pitching the terrorist plot to the defendant, the defendant made abundantly clear to Defreitas that he held negative views about, and harbored resentment towards, the U.S. government. Indeed, Steven Francis testified that the defendant's anti-American sentiments were a large part of the reason Defreitas decided to present him with the plan. (T 250-52). Representative samples

of the defendant's recorded statements regarding his opinion of the United States include:

- "So America and the Jews created that situation in order to bomb and destroy Taliban.  And, uh, they create Bin Laden."  GE 424T at 4.

- "Well, the Arabs and them really in the back pocket of America . . . .  But these oppressive leadership then hold on to America for protection and defense against — what do they call them — the fundamentalists.  You know?  To help seek them out and search them and destroy them for the benefit of their kingdom so that America could continue to reap the benefit from Saudi oil, and Kuwait oil, and you know, Iraq oil."  GE 424T at 4.

- "Well, they will eventually collapse, you know, because the, the time will come when the brothers will move the war into America itself."  GE 424T at 5.

- "America fight the bloody outside all the time, with heavy bombs and you know.  But it take a war in America side then it's the destruction of America too.  But I have just enough Muslims in America who are revolutionaries who would blow up America."  GE 424T at 5.

When Defreitas presented the plot to the defendant later on in the same conversation, he made clear that the plan was motivated by a desire to retaliate against the United States government for perceived wrongs it had committed against Defreitas personally and the global Muslim population generally. He told Ibrahim:  "'Cause we will do it in the name of Allah because we, um, so much suppressed and so much murdered and so many things has been committed against Muslims, uh, in every country, even Trinidad, even Guyana.  It's still happening in America, the Far East, and we got something that even the Twin Towers couldn't, can't touch it."  GE 424T at 42-43.

Upon learning of and joining the plot, the defendant recommended presenting it to international contacts, further demonstrating his knowledge that the plot's ultimate goal was geopolitical in nature.  He noted that there was no "Shiite movement" in Trinidad ready to take on such a "big challenge," and stated that the plan was probably best presented to movements in the Far East.  GE 424T at 54.  In particular, he recommended sending an emissary to the "revolutionary movement" in Iran.  GE

425T at 20-21.  As Dr. Matthew Levitt testified, the revolutionary government of Iran is a designated state sponsor of terrorism that "definitely sees the use of violence and terrorism as a legitimate means of furthering its foreign policy objectives, along with diplomacy and other things."  (T 672, 687).

In the light of the foregoing, there can be no serious question that Kareem Ibrahim was "involved in," or at a minimum "intended to promote," a federal crime of terrorism.  U.S.S.G. § 3A1.4(a).  The plot to attack JFK Airport that Ibrahim joined was intended to influence by means of intimidation and retaliate against the government of the United States of America.  18 U.S.C. § 2332b(g)(5)(A).  The defendant was well aware of that fact when he joined the plot and offered the plotters his support.  Whatever eleventh-hour excuse is offered at sentencing to explain the defendant's motive for helping commit a terrorist attack at JFK Airport, the government has clearly established by a preponderance of the evidence that he intended to promote a federal crime of terrorism.  See, e.g., Awan, 607 F.3d at 317 (holding defendant's "motive is simply not relevant" to determining whether crime which he intended to promote was intended to coerce, influence or retaliate against government).

C.    Application of the Terrorism and Obstruction of Justice Enhancements Does Not Violate *Apprendi* and Its Progeny

The defendant next argues that the application of the terrorism enhancement, U.S.S.G. § 3A1.4, and the obstruction of justice enhancement, U.S.S.G. § 3C1.1, would violate his Sixth Amendment rights as explained by the Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny.  See Def. Br. at 28-37, 39.  In particular, he argues that the Court does not have the authority to find the facts necessary to support the application of the enhancements proven by a preponderance of the evidence because those facts were not specifically found by the jury to be proven beyond a reasonable doubt.  The defendant's argument is legally unsound and should be rejected.

In a recent line of cases beginning with Apprendi, the Supreme Court has explained the application of the Sixth Amendment's guarantee of a right to a jury trial in the context of sentencing enhancements.  In the specific context of the United States Sentencing Guidelines, the Court held that if the Guidelines are advisory rather than mandatory, no Sixth Amendment violation results from their application to a defendant's conduct and sentence.  See, e.g., United States v. Booker, 543 U.S. 220, 233, 259-260 (2005) (holding that "merely advisory" Guidelines

"would not implicate the Sixth Amendment"); United States v. Singletary, 458 F.3d 72, 79-80 (2d Cir. 2006) ("judicial factfinding under the advisory Guidelines does not offend the Sixth Amendment").

Every single Supreme Court and Second Circuit Court of Appeals case interpreting Booker — including those recited in the defendant's lengthy survey of the Apprendi line of cases, see Def. Br. 28-34 — has consistently held that the application of advisory Guidelines enhancements neither implicates nor violates a defendant's Sixth Amendment right to a jury trial. See e.g., Dillon v. United States, 130 S. Ct. 2683, 2687-88 (2010) (noting that "render[ing] the Guidelines advisory" served to "remedy the constitutional problem" identified in Booker); Cunningham v. California, 549 U.S. 270, 285 (2007) (noting that there had been "no disagreement among the [Booker] Justices . . . . that the Federal Guidelines would not implicate the Sixth Amendment were they advisory"); United States v. Garcia, 413 F.3d 201, 220 n.15 ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker."); United States v. Gonzalez, 407 F.3d 118, 125 (2d Cir. 2005) (holding that, even after Booker, district courts retain the authority "to resolve disputed facts by a preponderance of the evidence when arriving at a Guidelines sentence"); United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("[W]ith the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection.").

Notwithstanding this clear precedent, the defendant submits that if the Court were to find the terrorism and obstruction of justice enhancements applicable to the calculation of his Guidelines range, the finding would somehow be in violation of his Sixth Amendment rights. There is simply no legal support for this proposition, and the defendant offers none. As Booker clearly held, an advisory Guidelines regime "that recommend[s], rather than require[s], the selection of particular sentences in response to differing sets of facts . . . [does] not implicate the Sixth Amendment." 543 U.S. at 233; see also Rita v. United States, 551 U.S. 338, 352 (2007) ("This Court's Sixth Amendment cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence."). There is nothing unique about the terrorism enhancement or the obstruction of justice enhancement, as compared to all the other sentencing enhancements contained in the advisory Guidelines, that makes their application result in a mandatory increase in the actual sentence imposed on the

defendant.   The Court remains free in terrorism cases and those
involving obstructive conduct, as in all others, to fashion a
sentence it considers "sufficient, but not greater than
necessary" according to factors outlined in 18 U.S.C. § 3553(a).
Because the application of the terrorism and obstruction of
justice enhancements recommends, rather than requires, the
selection of a particular sentence, no Sixth Amendment violation
follows.   See Rita, 551 U.S. at 352.

> D.   Applying the Terrorism and Obstruction of Justice
>      Enhancements Would Not Deprive Ibrahim of any
>      Constitutional Rights

The defendant next argues that he was prohibited from
testifying at trial about his "state of mind," his "decision-
making process" and "statements he had made on the recordings" -
all of which, the defendant submits, goes to the heart of the
obstruction of justice and terrorism enhancements.   Def. Br. at
42-43.   Accordingly, Ibrahim contends that applying either
enhancement would deprive him of his right to present a defense
and testify on his own behalf.   Id. at 42.   As discussed below,
there is no factual basis to defendant's argument, as he was
given ample opportunity to testify about all of these matters at
trial.

Ibrahim identifies three specific subjects about which
he claims he was prohibited from testifying: (1) whether he had
knowledge of the attack before Defreitas pitched the plot to him,
(2) why he did not say "no" after being told about the plot, and
(3) why he made various statements in his extradition affidavit.
Contrary to the defendant's assertion, Ibrahim was permitted to
testify at length about all three of these subjects.

First, Ibrahim was asked multiple questions by his
counsel on direct examination about what, if anything, he knew
about the plot prior to meeting Defreitas.   In response, Ibrahim
testified that he had not spoken to Kadir prior to meeting
Defreitas and Francis, (T 1106), and that when Defreitas and
Francis first spoke to him about the plot, he believed they were
speaking about a "natural, normal chicken farm."   (T 1096).
Defense counsel asked Ibrahim directly "did you ever want to blow
up an airport" to which Ibrahim replied "no."   Id.   Defendant's
suggestion that he was not permitted to testify about his prior
knowledge of the plot is baseless.

Second, defense counsel also asked Ibrahim numerous
questions about his reaction after learning about the plot.
Counsel asked Ibrahim whether he thought anything was going to

12

come of the plot to blow up the airport, and he replied that he didn't think "they were serious." (T 1101). Counsel then asked the defendant why he didn't think [Defreitas and Francis] were serious and the defendant replied "[f]or one or two men, three men or five or six men can't really, I mean, bring off a job like that." Id. Counsel then asked the defendant "[s]o why didn't you say no?" The defendant responded "I just went along with what was said." Id. After counsel asked him why, the defendant stated "[b]ecause if I disagree, to some extent I felt they believed that I will go to the police and that knowing what they intend to do I could agree. So I just went along and hope it will fizzle." Id. On re-direct, counsel again asked the defendant whether he wanted the plan to suceed, to which Ibrahim responded "no." (T 1285). The defendant went on to testify about why he didn't kick Defreitas and Francis out of his home, (T 1102), why he volunteered ideas and suggestions about how to further the plot, (T 1103), what he hoped would happen with the plot, (T 1104), and why he made various statements on the recordings, (T 1115-27).

Finally, defense counsel asked Ibrahim multiple questions about statements he made in his extradition affidavit. Specifically, counsel asked Ibrahim multiple times what he meant when he said in the affidavit that he had "a clear recollection of telling [Defreitas and Francis] they can't do that." (T 1287, 1289-90). While Ibrahim was not able to provide a coherent or believable explanation for this statement, he was certainly given the opportunity to do so.

As the basis for his claim that application of either the terrorism or obstruction of justice enhancements would be consitutional error, Ibrahim cites to various sustained objections where counsel was prohibited from asking inappropriate, leading or repetitive questions. Def. Br. at 43. While the Constitution guarantees a criminal defendant a meaningful opportunity to introduce relevant evidence on his behalf, this right is subject to reasonable restrictions "to accommodate other legitimate interests in the criminal trial process." United States v. Scheffer, 523 U.S. 303, 308 (1998)(internal quotations omitted). Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. See id. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate. Id.

13

Here, while the court properly ensured that both sides asked appropriate questions of the witnesses, at no time was Ibrahim foreclosed from testifying about his "state of mind."  As the trial record demonstrates, Ibrahim was given repeated opportunities to testify about his motivation for joining the plot and what he believed this involvement would entail.  As discussed above, throughout this testimony Ibrahim lied, contradicted himself and admitted to taking steps to further this plot.  Accordingly, there is no constitutional error in applying the obstruction of justice or terrorism enhancements.

E.    The PSR Correctly Assesses the Sentencing Range under the Guidelines

Because the defendant's objections lack merit, the Court should adopt the Guidelines calculation set forth in the PSR.  The Guidelines range "should serve as 'a benchmark or a point of reference or departure'" in determining the sentence. United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006) (quoting United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005)).  For the reasons set forth below, a sentence within or close to the Guidelines range will constitute just punishment for the defendant's extraordinarily serious criminal conduct.

II.    Application of Factors under 18 U.S.C. § 3553

A.    The Nature and Circumstances of the Offense Weigh in Favor of a Sentence within the Guidelines Range

As the evidence demonstrated at trial, had defendant Kareem Ibrahim and his coconspirators succeeded in their efforts to bomb JFK Airport and its fuel tanks and pipelines, they would have caused massive harm – personal and economic – to the United States, the City of New York and its residents and visitors.  It goes without saying that exploding bombs at one of the busiest airports in the world would have injured and killed scores of people.  Indeed, that was one of the goals of the plot.  (T 2496, 2514 (discussing the inevitable loss of lives)).  In addition to the injuries and loss of life, as intended by the plotters, such an attack would have caused severe harm to the economy of the United States and New York City by incapacitating one of the world's most important international transportation hubs. (T 2399-2401 (indicating that JFK Airport handled 440,000 flights, 48 million passengers and 1.7 million tons of cargo in 2007)). It is hard to imagine a conspiracy offense of a more serious nature than the offense of which the defendant stands convicted.

14

Moreover, the defendant played an important role in the terrorist offense.  As proven at trial, the defendant took important steps to transform the plot from a plan to a reality, including efforts to connect the conspirators to the Iranian revolutionary movement, which has demonstrated its terrorist capabilities, help the conspirators evade law enforcement detection, recruit additional conspirators, and counsel the conspirators on how to hide terrorist financing.

In sum, based on the extraordinarily serious nature of the offense and the defendant's role therein, a sentence within or close to the Guidelines range is warranted.

B.    History and Characteristics of the Defendant

The history and characteristics of the defendant also favor a sentence within or close to the Guidelines range.  As indicated in the PSR, the defendant enjoyed a middle-class upbringing in which his needs were provided for by his family. PSR, ¶ 118.  He completed his high school education and secured a government job with a pension.  Id. at ¶¶ 132-33.  He was married and divorced three times, but enjoyed a supportive family network.  Id. at ¶¶ 121-23.  As a result, the defendant cannot lay claim to any external factors or pressures to explain his participation in the deadly terrorist plot to attack JFK Airport.

Rather, as proven by the recordings entered into evidence, the defendant's participation in the plot was the product of his own commitment to a warped and violent interpretation of Islam.  Indeed, before he even learned of and joined the terrorist plot to attack JFK Airport, Ibrahim indicated: that he was happy when he heard about the 9/11 attack, GE 424T at 38, that the time would come when his brothers would move the war into the United States, id. at 5, that he had enough fellow Muslim revolutionaries in America to blow up the United States, id., that the United States was vulnerable and that massive buildings in Manhattan would start to crumble, id. at 6, that he was close with Abu Bakr, who car-bombed a police station and executed a coup attempt to establish an Islamic state in Trinidad, id. at 20, that in order to carry out a revolution, you need to be ready to take it all the way and die in the way of Allah, which is a victory in and of itself, id. at 25.  These statements are powerful evidence of a key characteristic of the defendant which counsels a sentence within or close to the Guidelines range: his commitment to violence in support of an Islamic revolution.

15

Moreover, the recordings and other evidence demonstrate the defendant's links to Iran and its worldwide revolutionary movement, which also favor a sentence within or close to the Guidelines range. On the recordings entered into evidence, the defendant informed his fellow plotters of his links to Iranian leaders stationed in the Caribbean, who visited his home, see GE 424T at 35, 42, including the Iranian Ambassador to whom Kadir was sending intelligence reports regarding Guyana, see, e.g., GEs 303, 303A-F, 307. And Ibrahim was the plotter who convinced the conspirators to send the plot to the Iranian revolutionary movement for execution, GE 425T at 20-21, a plan which Kadir attempted to implement before he was arrested on his way to Iran to pitch the plot.

In considering the defendant's history and characteristics, the Court should also take into account that the defendant repeatedly committed perjury and submitted a sworn affidavit containing multiple falsehoods in an effort to obstruct justice. See supra.

The defendant argues that the Court should grant a downward adjustment of the defendant's sentence based on his health and age. Def. Br. at 45-47. However, the defendant's health and age did not prevent him from playing a key role in a terrorist plot. Moreover, since his arrival in the United States, the defendant has received medical care at United States Medical Centers in Springfield, Missouri and Devens, Massachusetts, and the Bureau of Prisons has demonstrated that it can provide appropriate care for the defendant's health conditions. PSR, ¶ 128.

In sum, the defendant's history and characteristics favor a sentence within or close to the Guidelines range.

C.    A Sentence within the Guidelines Range Would Reflect
      the Seriousness of the Offense, Promote Respect for the
      Law and Provide Just Punishment

There are few more serious offenses in the federal criminal code than plotting to commit a terrorist bombing against a public transportation system like JFK Airport. As set forth above, had the conspiracy achieved its objective, the consequences would have been extraordinarily severe: the death of numerous innocent victims, extensive injuries to other innocent people and a significant economic injury to New York City and the United States. Only a sentence within or close to the Guidelines range would reflect the seriousness of the offense.

16

Any sentence substantially below the Guidelines range would severely undermine respect for the law by suggesting that a terrorist can evade punishment by engaging in perjury and by rationalizing pernicious criminal conduct.  The evidence at trial demonstrated beyond a reasonable doubt the defendant's guilt.  Yet, in his sentencing submission, the defendant still attempts to shift blame.  Just as the jury rejected the defendant's false claims at trial, the Court should reject them at sentencing.  A sentence within or close to the Guidelines range would constitute the only just punishment for the offense.

D.   The Deterrence Factor Weighs in Favor of a Sentence within the Guidelines Range

The investigation and prosecution of this case represent a sterling example of how a proactive law enforcement strategy should work to fight terror within the federal criminal justice system: the identification of terrorist conspirators, an effective investigation yielding a wealth of evidence and a successful federal criminal prosecution.  To allow any defendant – but particularly a proven terrorist conspirator found guilty of plotting to explode bombs, fuel tanks and pipelines at a crowded airport – to escape just punishment through perjury and blame shifting would send a terrible message to all parties involved in the criminal justice system.  As a result, the deterrence factor also supports a sentence within the Guidelines range.

E.   Conditions of Confinement

The defendant argues that his the conditions of his incarceration have been "detrimental," warranting a lesser sentence.  Def. Br. at 49.  However, as set forth above, the Bureau of Prisons and the Court have taken elaborate steps to safeguard the defendant's health.  Indeed, for almost all of the pre-trial period, the Bureau of Prisons housed the defendant at Federal Medical Centers that provided the defendant with excellent medical care.  The Court held numerous conferences with the parties to ensure that the conditions of confinement of the defendant were beneficial and expressed an openness to entertaining petitions relating to the conditions of the defendant's confinement at any time.  As the parties were able to work together to monitor the defendant's health and the Bureau of Prisons was able to provide beneficial treatment through its medical centers, no formal motions or petitions were filed regarding the conditions of confinement.  During the trial, the Court engaged an Emergency Medical Technician to monitor the health of the defendant, see PSR, ¶ 128, though no active assistance turned out to be necessary.

17

As a result of the efforts of the parties and the Bureau of Prisons, as well as the Court, there is simply no basis for a reduced sentence based on conditions of confinement.

F.    Other Factors

None of the other factors identified in § 3553(a) are applicable to the case at hand.  See 18 U.S.C. § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement"); § 3553(a)(7) ("need to provide restitution").

III.    Conclusion

By playing a key role in a dangerous plot to explode bombs, fuel tanks and pipelines at JFK Airport, defendant Kareem Ibrahim committed one of the most serious crimes in the United States Code.  A reasonable and just sentence for that crime would be a sentence within or close to the Guidelines range of life in prison.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney


By:    _____/s/_____
Marshall L. Miller
Zainab Ahmad
Berit W. Berger
Assistant U.S. Attorneys
(718) 254-6421/6522/6134


cc:    Clerk of the Court (DLI) (via ECF)
       Michael Hueston, Esq. (via overnight mail)
       Zoe Dolan, Esq. (via overnight mail)
       Officer Frank M. Marcigliano, Jr. (by hand)